JAMES L. WHEWAY, JR. *v.* WARDEN, STATE PRISON
(13623)
JOHN ANTHONY GRAHAM *v.* WARDEN, STATE PRISON
(13624)

PETERS, C. J., CALLAHAN, GLASS, COVELLO and HULL, Js.

Argued April 12—decision released June 19, 1990

*L. D. McCallum,* assistant attorney general, with whom, on the brief, was *Clarine Nardi Riddle,* attorney general, for the appellant-appellee in the first case, appellee in the second case (respondent in both cases).

*Louis S. Avitabile,* special public defender, with whom, on the brief, was *Denise Dishongh,* special public defender, for the appellee-appellant in the first case, appellant in the second case (petitioners).

COVELLO, J. These consolidated appeals involve two out-of-state parolees who, after transferring to Connecticut for parole supervision pursuant to the Uniform Act for Out-of-State Parolee Supervision, General Statutes §§ 54-132 through 54-138 (Uniform Act),[1] subse-

---

[1] "[Connecticut General Statutes] Sec. 54-132. DEFINITIONS. As used in sections 54-133 to 54-138, inclusive, the term 'receiving state' means any state, other than the sending state, in which a parolee or probationer may

quently committed crimes in Connecticut. They were convicted and sentenced for those crimes and, there-

be found, provided such state is a party to said sections, and the term 'state' means any one of the several states and the Commonwealth of Puerto Rico, the Virgin Islands and the District of Columbia.

"Sec. 54-133. INTERSTATE COMPACT FOR PAROLEE SUPERVISION. (a) The governor is authorized and directed to execute a compact on behalf of the state of Connecticut with any of the United States legally joining therein in the form substantially as follows: A compact entered into by and among the contracting states, signatories hereto, with the consent of the Congress of the United States of America, granted by an act entitled 'An act granting the consent of Congress to any two or more states to enter into agreements or compacts for cooperative effort and mutual assistance in the prevention of crime and for other purposes.' The contracting states solemnly agree: (1) That it shall be competent for the duly constituted judicial and administrative authorities of a state party to this compact (herein called 'sending state'), to permit any person convicted of an offense within such state and placed on probation or released on parole to reside in any other state party to this compact (herein called 'receiving state'), while on probation or parole, if (a) such person is in fact a resident of, or has his family residing within, and is able to obtain employment within, the receiving state; (b) though such person is not a resident of the receiving state and has no family residing therein, the receiving state consents to allow him to reside therein; provided, before such permission shall be granted, opportunity shall be granted to the receiving state to investigate the home and prospective employment of such person; a resident of the receiving state, within the meaning of this section, being construed to be one who has been an actual inhabitant of such state continuously for more than one year prior to his coming to the sending state and who has not resided within the sending state more than six continuous months immediately preceding the commission of the offense for which he has been convicted; (2) that each receiving state shall assume the duties of visitation of and supervision over probationers or parolees of any sending state and in the exercise of such duties will be governed by the same standards that prevail for its own probationers and parolees; (3) that duly accredited officers of a sending state may, at all times, enter a receiving state and there apprehend and retake any person on probation or parole, and for that purpose no formalities shall be required other than establishing the authority of the officer and the identity of the person to be retaken; all legal requirements to obtain extradition of fugitives from justice are being expressly waived on the part of the states party hereto, as to such persons and the decision of the sending state to retake a person on probation or parole to be conclusive upon and not reviewable within the receiving state; provided, if, at the time when a state shall seek to retake a probationer or parolee, there shall be pending against him within the receiving state any criminal charge, or he shall be suspected

upon, filed petitions for writs of habeas corpus challenging pending parole violation detainers lodged against

of having committed within such state a criminal offense, he shall not be retaken without the consent of the receiving state until discharged from prosecution or from imprisonment for such offense; (4) that the duly accredited officers of the sending state shall be permitted to transport prisoners being retaken through any and all states parties to this compact, without interference; (5) that the governor or each contracting state may designate an officer who, acting jointly with like officers of other contracting states, if and when appointed, shall promulgate such rules and regulations as may be deemed necessary to more effectively carry out the terms of this compact; (6) that this compact shall become operative immediately upon its execution by any state as between it and any other state or states so executing and, when executed, it shall have the full force and effect of law within such state, the form of execution to be in accordance with the laws of the executing state; (7) that this compact shall continue in force and remain binding upon each executing state until renounced by it, that the duties and obligations hereunder of a renouncing state shall continue as to parolees or probationers residing therein at the time of withdrawal until they shall be retaken or finally discharged by the sending state and that renunciation of this compact shall be by the same authority which executed it, by the sending of six months' notice in writing of its intention to withdraw from the compact to each other state party hereto. Whenever the duly constituted judicial and administrative authorities in a sending state shall determine that incarceration of a probationer or reincarceration of a parolee is necessary or desirable, said officials may direct that the incarceration or reincarceration be in a prison or other correctional institution within the territory of the receiving state, such receiving state to act in that regard solely as agent for the sending state.

"(b) If any section, sentence, subdivision or clause of this section is for any reason held invalid or to be unconstitutional, such decision shall not affect the validity of the remaining portions of this section.

"(c) Sections 54-132 to 54-138, inclusive, may be cited as the Uniform Act for Out-of-State Parolee Supervision.

"Sec. 54-134. DESIGNATION OF 'COMPACT INSTITUTIONS.' Every state which adopts sections 54-132 to 54-138, inclusive, shall designate at least one of its correctional institutions as a 'Compact Institution' and shall incarcerate persons therein as provided in section 54-133 unless the sending and receiving states in question make specific contractual arrangements to the contrary. All states party to sections 54-132 to 54-138, inclusive, shall have access to 'Compact Institutions' at all reasonable hours for the purpose of inspecting the facilities thereof and for the purpose of visiting such of said state's prisoners as may be confined in the institution.

"Sec. 54-135. TRANSFERS TO OTHER CORRECTIONAL INSTITUTIONS. Persons confined in 'Compact Institutions' pursuant to the terms of this com-

them by the states from which they were transferred. The principal issues raised are: (1) whether the trial court has the authority to dismiss or otherwise amend an out-of-state parole violation warrant lodged against a sentenced prisoner; (2) whether the Uniform Act requires an immediate parole revocation hearing and creates the right to serve the remaining portion of an out-of-state sentence in Connecticut; (3) whether a parolee has a liberty interest in programs requiring

pact shall at all times be subject to the jurisdiction of the sending state and may at any time be removed from said 'Compact Institution' for transfer to a prison or other correctional institution within the sending state, for return to probation or parole, for discharge, or for any other purpose permitted by the laws of the sending state.

"Sec. 54-136. INCARCERATION IN RECEIVING STATE NOT TO AFFECT RIGHTS IN SENDING STATE. All persons confined in a 'Compact Institution' pursuant to the provisions of sections 54-132 to 54-138, inclusive, shall be treated in a reasonable and humane manner. The fact of incarceration or reincarceration in a receiving state shall not deprive any person so incarcerated or reincarcerated of any rights which such person would have had if incarcerated or reincarcerated in an appropriate institution of the sending state; nor shall any agreement to submit to incarceration or reincarceration pursuant to the terms of said sections be construed as a waiver of any rights which the prisoner would have had if he had been incarcerated or reincarcerated in an appropriate institution of the sending state, except that the hearing or hearings, if any, to which a parolee or probationer may be entitled, prior to incarceration or reincarceration, by the laws of the sending state may be had before the appropriate judicial or administrative officers of the receiving state. In this event, said judicial and administrative officers shall act as agents of the sending state after consultation with appropriate officers of the sending state.

"Sec. 54-137. REIMBURSEMENT FOR EXPENSES. Any receiving state incurring costs or other expenses under sections 54-132 to 54-138, inclusive, shall be reimbursed in the amount of such costs or other expenses by the sending state unless the states concerned specifically otherwise agree. Any two or more states party to said sections may enter into supplementary agreements determining a different allocation of costs as among themselves.

"Sec. 54-138. RATIFICATION. REGULATIONS. Sections 54-132 to 54-138, inclusive, shall take effect when ratified by any two or more states party to the compact and shall be effective as to those states which have specifically ratified said sections. Rules and regulations necessary to effectuate the terms of said sections may be promulgated by the appropriate officers of those states which have ratified said sections."

decreased security that are affected by an out-of-state parole violation detainer; (4) whether liberty interests are violated when a parolee is classified as a maximum security prisoner solely on the basis of a parole violation detainer; (5) whether a parole violation detainer is a true and valid detainer that must be afforded comity; and (6) whether the parole revocation hearing must await the conclusion of the prisoner's Connecticut sentence.

In the first case, the petitioner, James L. Wheway, Jr., was convicted of robbery in Mississippi. On October 23, 1980, he was sentenced to twelve years imprisonment with execution suspended after seven years to be followed by five years probation. On April 19, 1982, Mississippi authorities granted parole and transferred Wheway's parole supervision to Connecticut pursuant to the Uniform Act and Mississippi Code Annotated § 47-7-71.[2] On June 5, 1984, police arrested

---

[2] "[Mississippi Code Annotated] § 47-7-71. UNIFORM ACT FOR OUT-OF-STATE PAROLEE SUPERVISION.

"I. The governor of this state is hereby authorized and directed to execute a compact on behalf of the state of Mississippi with any of the United States legally joining therein in the form substantially as follows:

A Compact

"Entered into by and among the contracting states, signatories hereto, with the consent of the congress of the United States of America, granted by an act entitled 'An act granting the consent of Congress to any two (2) or more states to enter into agreements or compacts for cooperative effort and mutual assistance in the prevention of crime and for other purposes.'

"The contracting states solemnly agree:

"(1) That it shall be competent for the duly constituted judicial and administrative authorities of a state party to this compact (herein called 'sending state'), to permit any person convicted of an offense within such state and placed on probation or released on parole to reside in any other state party to this compact (herein called 'receiving state'), while on probation or parole, if

"(a) Such person is in fact a resident of or has his family residing within the receiving state and can obtain employment there;

Wheway in Wallingford and charged him with robbery. On October 19, 1984, Mississippi authorities lodged a

"(b) Though not a resident of the receiving state and not having his family residing there, the receiving state consents to such person being sent there.

"Before granting such permission, opportunity shall be granted to the receiving state to investigate the home and prospective employment of such person.

"A resident of the receiving state, within the meaning of this section, is one who has been an actual inhabitant of such state continuously for more than one (1) year prior to his coming to the sending state and has not resided within the sending state more than six (6) continuous months immediately preceding the commission of the offense for which he has been convicted.

"(2) That each receiving state will assume the duties of visitation of and supervision over probationers or parolees of any sending state and in the exercise of those duties will be governed by the same standards that prevail for its own probationers and parolees.

"(3) That duly accredited officers of a sending state may at all times enter a receiving state and there apprehend and retake any person on probation or parole. For that purpose no formalities will be required other than establishing the authority of the officer and the identity of the person to be retaken. All legal requirements to obtain extradition of fugitives from justice are hereby expressly waived on the part of states party hereto, as to such persons. The decision of the sending state to retake a person on probation or parole shall be conclusive upon and not reviewable within the receiving state: Provided, however, that if at the time when a state seeks to retake a probationer or parolee there should be pending against him within the receiving state any criminal charge, or he should be suspected of having committed within such state a criminal offense, he shall not be retaken without the consent of the receiving state until discharged from prosecution or from imprisonment for such offense.

"(4) That the duly accredited officers of the sending state will be permitted to transport prisoners being retaken through any and all states parties to this compact, without interference.

"(5) That the governor of each state may designate an officer who, acting jointly with like officers of other contracting states, if and when appointed, shall promulgate such rules and regulations as may be deemed necessary to more effectively carry out the terms of this compact.

"(6) That this compact shall become operative immediately upon its execution by any state as between it and any other state or states so executing. When executed it shall have the full force and effect of law within such state, the form of execution to be in accordance with the laws of the executing state.

"(7) That this compact shall continue in force and remain binding upon each executing state until renounced by it. The duties and obligations hereunder of a renouncing state shall continue as to parolees or probationers

violation of parole detainer against Wheway with the Connecticut authorities. On November 30, 1984, the trial court sentenced Wheway to twenty years imprisonment with execution suspended after twelve years for the robbery in Wallingford and five lesser, concurrent sentences.

Because of his Mississippi parole violation detainer, Wheway is classified as a maximum security prisoner for the duration of his Connecticut sentence. Thus classified, he is ineligible by reason of the prison's rules for any early release programs, including furloughs, work release or home release. If the out-of-state parole violation detainer were not pending, Wheway would have been eligible for work release and home release in April, 1989, but as a maximum security prisoner he will not be eligible for release until April 19, 1991.

Wheway attempted to have either a parole hearing in Mississippi or a parole hearing in Connecticut, pursuant to General Statutes § 54-136.[3] Mississippi authorities took the position that they will not act on the parole violation detainer until Wheway completes his Connecticut sentence.

On November 13, 1987, Wheway filed a petition for a writ of habeas corpus. Wheway alleged, inter alia, that he had a right to an immediate parole revocation hearing on the Mississippi parole violation detainer because his liberty interest in the conditions and length of his confinement would otherwise be violated.

---

residing therein at the time of withdrawal until retaken or finally discharged by the sending state. Renunciation of this compact shall be by the same authority which executed it, by sending six (6) months' notice in writing of its intention to withdraw from the compact to the other state party hereto.

"II. This section may be cited as the uniform act for out-of-state parolee supervision."

[3] See footnote 1, supra.

On October 3, 1988, the trial court, *Axelrod, J.*, granted Wheway's petition and entered an order quashing the parole violation detainer unless, within ninety days, Mississippi authorities afforded Wheway a parole revocation hearing in Connecticut. The respondent warden thereupon appealed to the Appellate Court, and Wheway cross appealed.

In the second case, the petitioner, John A. Graham, was convicted and imprisoned in Ohio. In February, 1982, Ohio authorities granted him parole and in August, 1982, transferred Graham's parole supervision to Connecticut pursuant to the Uniform Act. See footnote 1, supra. On February 14, 1983, police arrested Graham and charged him with crimes in Connecticut. On March 4, 1983, Ohio authorities declared the petitioner to be a parole violator and issued a warrant for his arrest that remains lodged against him as a detainer. On November 19, 1983, Graham was sentenced to thirty years imprisonment based upon his convictions for the Connecticut crimes. Without disposing of the alleged parole violation, he is unable to qualify for prison programs involving reduced levels of security.

On October 27, 1986, Graham filed a petition for a writ of habeas corpus. The petition alleged, inter alia, the right to an immediate parole revocation hearing either in Connecticut or Ohio. On February 4, 1988, the habeas court, *Santos, J.*, denied Graham's petition. Graham appealed to the Appellate Court where the matter was consolidated with the Wheway appeal. We thereafter transferred both matters to ourselves pursuant to Practice Book § 4023.

I

In *Wheway*, the warden first claims that the trial court is without authority to quash, dismiss, strike or otherwise issue an order with respect to an out-of-state

parole violation warrant lodged as a detainer against a sentenced prisoner. We agree.

With respect to this issue, the habeas court concluded "that it has the authority to dismiss the detainer lodged if it appears that the detainer itself is subject to dismissal in Mississippi or if it violates the Due Process Clause of the United States Constitution." The habeas court relied upon this court's decision in *Remick* v. *Lopes,* 203 Conn. 494, 525 A.2d 502 (1987), in reaching its conclusion. *Remick* involved the Interstate Agreement on Detainers (IAD), Connecticut General Statutes § 54-186. In *Remick* we noted that the purpose of the IAD was " 'to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and *all detainers* based on *untried indictments, informations or complaints* . . . .' (Emphasis added.)" (Additional emphasis added.) *Remick* v. *Lopes,* supra, 500.

The IAD also provides that failure to comply with the agreement's speedy trial provisions can nullify the effect of the detainer: "If the appropriate authority shall refuse or fail to accept temporary custody of said person, or in the event that an action on the *indictment, information or complaint* on the basis of which the detainer has been lodged is not brought to trial within the period provided . . . the appropriate court of jurisdiction where the *indictment, information or complaint* has been pending shall enter an order dismissing the same with prejudice, and any detainer based thereon shall cease to be of any force or effect." (Emphasis added.) Connecticut General Statutes § 54-186, Art. V (c).

The United States Supreme Court, however, in *Carchman* v. *Nash,* 473 U.S. 716, 105 S. Ct. 3401, 87 L. Ed. 2d 516 (1985), concluded that detainers based upon probation or parole violation warrants are *not*

based on "untried indictments, informations or complaints"; *Remick* v. *Lopes,* supra, 500; and therefore are not subject to disposition under the IAD. "Adoption of the [IAD] was motivated in part by a practice of filing detainers based on untried criminal charges that had little basis. These detainers often would be withdrawn shortly before the prisoner was released. Even though unsubstantiated, the detainers would have a detrimental effect on the prisoner's treatment. Article III enables a prisoner to require the state lodging the detainer either to drop the charge and resulting detainer or to bring the prisoner to trial. In this way, the prisoner can clear his record of unsubstantiated charges.

"A probation-violation detainer, however, generally . . . will be based on the prisoner's commission of the crimes that resulted in his conviction and incarceration in the sending State. Because the convictions conclusively establish the probation-violation, see *Morrisey* v. *Brewer,* 408 U.S. [471, 490, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972)] (parole revocation hearing), the probation-violation charge will not be unsubstantiated. Thus, the abuses that in part motivated the adoption of the [IAD] generally do not occur in the context of probation-violation detainers." *Carchman* v. *Nash,* supra, 730–31. We find the *Carchman* rationale persuasive and conclude, therefore, that neither *Remick,* the IAD, nor the Uniform Act serves as a basis for the habeas court's order conditionally quashing the Mississippi detainer and that it was therefore without authority to do so.

Even apart from the habeas court's ultimate conclusion, the warden challenges the court's predicate conclusion that General Statutes §§ 54-133 and 54-136 "create a liberty interest in having a Mississippi parole revocation hearing held in Connecticut and serving the

remaining Mississippi parole sentence in Connecticut." We agree with the warden.

Section 54-136 provides: *"All persons confined . . . pursuant to the provisions of sections 54-132 to 54-138,* inclusive, shall be treated in a reasonable and humane manner. The fact of incarceration or reincarceration in a receiving state shall not deprive any person so incarcerated or reincarcerated of any rights which such person would have had if incarcerated or reincarcerated in an appropriate institution of the sending state . . . [and] the hearing or hearings, if any, to which a parolee or probationer may be entitled, prior to incarceration or reincarceration, by the laws of the sending state may be had before the appropriate judicial or administrative officers of the receiving state. In this event, said judicial and administrative officers shall act as agents of the sending state after consultation with appropriate officers of the sending state." (Emphasis added.)

The petitioner's claim that he has a statutory right to an immediate parole revocation hearing under the foregoing statute overlooks that fact that he is not a person *"confined . . . pursuant to the provisions of sections 54-132 to 54-138, inclusive."* (Emphasis added.) The petitioner has been convicted of a crime committed in Connecticut. He is confined under a commitment mittimus pursuant to General Statutes § 54-97[4] and is not

---

[4] "[Connecticut General Statutes] Sec. 54-97. MITTIMUS REQUIRED. EXCEPTION. No person may be committed to the Connecticut Correctional Institution, Somers, or a community correctional center without a mittimus signed by the judge or clerk of the court which committed him, declaring the cause of commitment and requiring the warden or community correctional center administrator to receive and keep him in the Correctional Institution, Somers, or the community correctional center, as the case may be, for the period fixed by the judgment of said court or until he is legally discharged; and such mittimus shall be sufficient authority to the officer to commit such person, and to the warden or community correctional center

"confined . ... *pursuant to the provisions of sections 54-132 to 54-138, inclusive."* (Emphasis added.) Therefore, the provisions of § 54-136 do not presently apply to him and cannot furnish a basis for a claim to an immediate parole violation hearing.

In response to the petitioner's claim that he is entitled to serve the balance of the Mississippi sentence in Connecticut and in further response to his claim to an immediate parole revocation hearing, we observe that § 54-133 addresses both issues. It provides: "[I]f, at the time when a state shall seek to retake a probationer or parolee, there shall be pending against him within the receiving state any criminal charge, or he shall be suspected of having committed within such state a criminal offense, *he shall not be retaken without the consent of the receiving state until discharged from prosecution or from imprisonment for such offense."* (Emphasis added.) General Statutes § 54-133 (a) (3). This language clearly contemplates: (1) a return to the sending state; and (2) parole revocation proceedings that shall be subsequent to any "imprisonment for such offense." Thus, contrary to the petitioner's assertion and the habeas court's conclusion, we find that a detained parole violator is neither entitled to an immediate parole revocation hearing while incarcerated for subsequent Connecticut convictions nor entitled to serve the balance of any out-of-state prison terms in Connecticut.

II

In his cross appeal, Wheway first argues that the habeas court erred in failing to conclude that his constitutionally protected liberty interests in his conditions of confinement were violated by his classification as

administrator to receive and hold him in custody, except that any community correctional center may receive any person as provided in section 7-135 without such mittimus."

a maximum security prisoner solely on the basis of the parole violation detainer. We do not agree.

The habeas court found that at the Connecticut Correctional Institution at Somers, conditions of confinement involving the granting of furloughs, work release, home release, education release, home visits, etc., are governed by the Inmate Handbook of Regulations and Programs. The granting or denial of the various types of furloughs is entirely discretionary with prison authorities.

In *Moody* v. *Daggett,* 429 U.S. 78, 97 S. Ct. 274, 50 L. Ed. 2d 236 (1976), a federal parolee who was imprisoned for federal crimes committed while he was on parole filed a petition for a writ of habeas corpus. He claimed a violation of his constitutionally protected liberty interest by reason of his being denied a prompt hearing on his pending parole revocation. The court concluded that the due process clause of the fourteenth amendment did not mandate an immediate parole revocation hearing. Id., 86. The *Moody* v. *Daggett* rationale was thereafter extended to circumstances similar to those found here, i.e., to parole violation warrants lodged as detainers by one state with prison authorities of another state. See *Heath* v. *United States Parole Commission,* 788 F.2d 85 (2d Cir. 1986).

The *Moody* court established the further proposition that not every state action that carries adverse consequences for prison inmates automatically implicates or effectuates a due process right. Prison classification and eligibility for various rehabilitation programs, wherein prison officials have full discretion to control those conditions of confinement, do not create a statutory or constitutional entitlement sufficient to invoke due process. *Moody* v. *Daggett,* supra, 88–89 n.9; see also *Meachum* v. *Fano,* 427 U.S. 215, 96 S. Ct. 2532, 49 L. Ed. 2d 451, reh. denied, 429 U.S. 24, 97 S. Ct.

191, 50 L. Ed. 2d 191 (1976). In order for Wheway's conditions of confinement to qualify as a constitutionally protected "liberty," the interest must be one that is assured by either statute, judicial decree or regulation. See *Wolff* v. *McDonald,* 418 U.S. 539, 557–59, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974). Wheway must demonstrate that the conditions of confinement in question are not matters that prison officials have full discretion to control. *Moody* v. *Daggett,* supra; *Meachum* v. *Fano,* supra, 228.

Because the prison authorities have full discretion to grant or deny the early release programs that would relieve Wheway from his confinement, he does not have a legitimate statutory or constitutional entitlement sufficient to invoke due process considerations. *Moody* v. *Daggett,* supra, 88 n.9. We have recently so held under similar circumstances in *Asherman* v. *Meachum,* 213 Conn. 38, 48–49, 566 A.2d 663 (1989).

Wheway finally claims that his parole violation detainer is not a "true" detainer, is not entitled to comity, and therefore should be stricken from his record. Specifically, he claims that since the Mississippi authorities have neither taken custody of him nor revoked his parole, the request for comity "has been totally abused by Mississippi." Wheway furnishes no authority for this unique claim nor does our research disclose any legal basis for such a claim. Accordingly, we find it to be without merit. See *Moody* v. *Daggett,* supra, 80 n.2; see also *Carchman* v. *Nash,* supra, 719.

### III

In *Graham,* the petitioner argues on appeal that the trial court erred: (1) in following *Moody* v. *Daggett,* supra, and holding that he had no right to a parole revocation hearing until his Connecticut sentence was con-

cluded; and (2) in concluding that it did not have the authority to strike the detainer from his record. We disagree.

Ohio Administrative Code § 5120:1-1-19 provides in pertinent part: "(2) The hearing for a releasee who has been convicted in a state other than the State of Ohio, and is being returned as a violator, shall be held within a reasonable period of time *after his return to confinement* within the boundaries of the state of Ohio." (Emphasis added.) Connecticut General Statutes § 54-133 (a) (3) provides that "if, at the time when a state shall seek to retake a probationer or parolee, there shall be pending against him within the receiving state any criminal charge, or he shall be suspected of having committed within such state a criminal offense, *he shall not be retaken without the consent of the receiving state until discharged from prosecution or from imprisonment for such offense."* (Emphasis added.) The language of Ohio's corresponding statute is virtually identical. See Ohio Rev. Code Ann. § 5149.17.

It is clear that Ohio, like Mississippi and Connecticut, follows *Moody.* Ohio authorities delay the final revocation hearing until the intervening sentence is completed and the parolee is returned to Ohio. Here, the Ohio authorities, like their Mississippi counterparts in *Wheway,* have not requested the return of the parole violator before the expiration of his Connecticut sentence. Also, as in *Wheway,* Connecticut authorities have not given and do not currently plan to consent to the parole violator's return to the receiving state until his term of imprisonment in Connecticut expires. Ohio authorities, like their Mississippi counterparts in *Wheway,* ask only that the necessary arrangements be made for the transfer of the parole violator when Connecticut is willing to release him from its custody.

Graham also argues, as did Wheway, that the Uniform Act specifically provides that he cannot be deprived of any rights that would be reserved to him in the sending state by reason of his incarceration in Connecticut. We find Graham's claim no more persuasive then we did Wheway's. Ohio Administrative Code § 5120:1-1-19 (2) does not grant Graham any right to return to Ohio during the pendency of his Connecticut imprisonment for the purpose of a disposition of his parole violation warrant. As in *Wheway,* any dispute over when the parole violator may be entitled to a final parole revocation hearing can only be resolved when the parole violator is returned to the sending state at the conclusion of his Connecticut sentence.

Like Wheway, Graham also argues that he has an absolute right to have his out-of-state sentence run concurrently with his Connecticut sentence. We are equally unpersuaded. Ohio Revised Code Annotated § 2967.15 provides that "[a] convict who has been conditionally pardoned or a prisoner who has been paroled, who in the judgment of the adult parole authority, has violated the conditions of his pardon or parole shall be declared a violator. In such case, the time from the date of the declared violation of his pardon or parole to the date he becomes available for return to the institution *shall not be counted as a part of time or sentence served."* (Emphasis added.) "As has been pointed out many times, the period during which one is at large as a parole violator is not credited on one's sentence. *Cline* v. *Haskins,* (1964), 175 Ohio St. 480, [196 N.E.2d 440,] 26 O.O. 2d 91; *Smouse* v. *Perini,* (1968), 16 Ohio St. (2d) 13, [242 N.E.2d 340,] 45 O.O. (2d) 261." *Hignite* v. *Cardwell,* 22 Ohio St. 2d 146, 147, 258 N.E.2d 443 (1970). "A parole violator, in Ohio, does not begin to serve the continuation of his sentence until he is returned to a penal institution under order of the parole board." *Stepp* v. *Lutz,* 348 F.2d 466, 467 (6th Cir. 1965).

"Under the law of Ohio, the time required for the petitioner to serve his sentence . . . is extended by the amount of time lost on parole when he [is] not available to be returned to the Ohio authorities." *Cox* v. *Maxwell,* 366 F.2d 765, 766–67 (6th Cir. 1966).

Graham's last claim is that the trial court has the authority to and should strike the detainer from his record. We examined and rejected this same claim in *Wheway,* supra, and for the reasons discussed therein we again conclude that the trial court is without such authority.

In the first case, the judgment is reversed as to the issues on the appeal and the case is remanded to the trial court with direction to deny the petition; the judgment is affirmed as to the issues on the cross appeal.

In the second case, the judgment is affirmed.

In this opinion the other justices concurred.