******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ANTHONY A. *v.* COMMISSIONER OF CORRECTION*
(SC 19565)

Rogers, C. J., and Palmer, Eveleigh, McDonald,
Espinosa and Robinson, Js.*

*Syllabus*

The petitioner sought a writ of habeas corpus, claiming that the respondent
Commissioner of Correction had incorrectly classified him as a sex
offender without providing procedural due process as required under
the federal constitution. The petitioner had been convicted of unlawful
restraint in the first degree, failure to appear and violation of probation.
Prior to the petitioner's incarceration, the state entered a nolle prosequi
as to a charge of sexual assault in a spousal relationship after the
petitioner's wife recanted her statement to the police that the petitioner
had sexually assaulted her during the same incident that formed the basis
for the charges of which he was convicted. Thereafter, the respondent
classified the petitioner as a sex offender, even though the petitioner
was never convicted of a sex offense and had no prior history as a sex
offender. As a result of that classification, the Department of Correction
required the petitioner to participate in sex offender treatment or risk
forfeiture of supervised community release, parole and the opportunity
to earn risk reduction earned credit. The petitioner refused to participate
in treatment. The habeas court dismissed the petition, concluding that,
because the petitioner failed to allege a protected liberty interest, the
court lacked subject matter jurisdiction. On the granting of certification,
the petitioner appealed to the Appellate Court, which reversed the
habeas court's judgment and remanded the case for a hearing on the
merits. The Appellate Court concluded that the petitioner's allegations
established a protected liberty interest under the stigma plus test applied
by the federal courts to determine whether an inmate who challenges,
inter alia, his allegedly wrongful classification as a sex offender has
established such an interest. On the granting of certification, the respon-
dent appealed to this court. *Held* that the petitioner's allegations in the
habeas petition, which this court was required to accept as true, were
sufficient to allege a protected liberty interest that conferred jurisdiction
on the habeas court, and, accordingly, the Appellate Court properly
reversed the habeas court's judgment; the petitioner satisfied his burden
of establishing a protected liberty interest under the applicable stigma
plus test, as the petitioner's allegation that the respondent had improp-
erly classified him a sex offender established stigma, and his allegation
that he was required to participate in sex offender treatment or risk
forfeiting parole eligibility, community release, and good time credits
established that he suffered negative consequences as a result of that
allegedly erroneous classification in that the consequences were qualita-
tively different from the punishments usually suffered by inmates such
that they constituted a major change in the conditions of confinement
that amounted to a grievous loss.

Argued February 23—officially released August 29, 2017

*Procedural History*

Petition for a writ of habeas corpus, brought to the
Superior Court in the judicial district of Tolland and
tried to the court, *Sferrazza, J.*; judgment dismissing
the petition, from which the petitioner, on the granting
of certification, appealed to the Appellate Court, *Alvord*,
*Sheldon* and *Norcott*, *Js.*, which reversed the habeas
court's judgment and remanded the case for further
proceedings, and the respondent, on the granting of
certification, appealed to this court. *Affirmed.*

*Edward Wilson*, *Jr.*, assistant attorney general, with

whom, on the brief, were *George Jepsen*, attorney general, and *Terrence M. O'Neill* and *Steven R. Strom*, assistant attorneys general, for the appellant (respondent).

*Richard E. Condon, Jr.*, senior assistant public defender, for the appellee (petitioner).

*Opinion*

ESPINOSA, J. The present appeal requires us to determine the appropriate test for resolving whether an inmate's prison classification implicates a protected liberty interest. The respondent, the Commissioner of Correction, appeals from the judgment of the Appellate Court reversing the judgment of the habeas court, which dismissed the petition for a writ of habeas corpus filed by the petitioner, Anthony A., for lack of subject matter jurisdiction.[1] *Anthony A.* v. *Commissioner of Correction*, 159 Conn. App. 226, 242, 122 A.3d 730 (2015). The respondent claims that, contrary to the conclusion of the Appellate Court, the habeas court properly dismissed the petition on the basis that the petitioner failed to allege a protected liberty interest. The petitioner responds that the allegations in the petition, which claim that he was incorrectly classified as a sex offender and that he suffered negative consequences as a result of that erroneous classification, sufficiently alleged a cognizable liberty interest to confer jurisdiction on the court. We agree with the petitioner and affirm the judgment of the Appellate Court.

Because this appeal arises from the habeas court's ruling dismissing the petition on the basis that the court lacked jurisdiction, we take the facts to be those alleged in the petition, including those facts necessarily implied from the allegations, construing them in favor of the petitioner for purposes of deciding whether the court had subject matter jurisdiction.[2] See *Dorry* v. *Garden*, 313 Conn. 516, 521, 98 A.3d 55 (2014). The allegations in the petition and attachments thereto establish that the petitioner is an inmate who was convicted after pleading guilty to unlawful restraint in the first degree, failure to appear and violation of probation. Initially, the victim, the petitioner's wife, also told the police that the petitioner had sexually assaulted her, but she subsequently recanted that statement, and the state entered a nolle prosequi as to the charge of sexual assault in a spousal relationship.

Upon the petitioner's incarceration, he was classified pursuant to an administrative directive of the Department of Correction (department), which provides in relevant part: "Each inmate under the custody of the Commissioner of Correction shall be classified to the most appropriate assignment for security and treatment needs to promote effective population management and preparation for release from confinement and supervision. . . ." Department of Correction, Administrative Directive 9.2 (1) (effective July 1, 2006) (Administrative Directive 9.2). An inmate's classification depends on his risks and needs scores, each of which is evaluated pursuant to specific factors. Administrative Directive 9.2 (8) (A) and (B).[3] Those scores and the resulting classification determine the inmate's "appropriate confinement location, treatment, programs and employ-

ment assignment whether in a facility or the community." Administrative Directive 9.2 (3) (A).

The department classified the petitioner as a sex offender, despite the fact that he had not been convicted of a sex offense and had no prior history as a sex offender.[4] As a consequence of the erroneous classification, the petitioner was offered a choice. He could participate in "sex treatment" that was recommended by his offender accountability plan or risk forfeiture of supervised community release, parole and the opportunity to earn risk reduction earned credit (good time credits). He refused to participate in treatment.

The petitioner subsequently filed this petition, claiming that he had been classified as a sex offender without being provided procedural due process. At the hearing on the petition, the court first heard argument as to whether it had jurisdiction. The petitioner argued that he had alleged sufficient facts to establish a cognizable liberty interest. Specifically, he argued that the classification had been predicated on erroneous facts, stigmatized him, and that he had been materially burdened by the classification.

As to those material burdens, the petitioner alleged that he suffered several negative consequences as a result of the classification. He alleged a direct causal link between the classification and his increased security status. He alleged a contingent relationship between the classification, the recommended treatment plan and his eligibility for good time credits, parole and community release. That is, he claimed that the department had notified him that if he did not participate in the recommended sex offender treatment, he risked forfeiting all three of those benefits. That claim finds support in the department's offender accountability plan that was attached to the petition and provides: "Failure to comply with [the plan's] recommendations . . . *shall* negatively impact your earning of [good time credits] . . . and/or chances of [department] supervised community release and/or parole." (Emphasis added.) Finally, although the petitioner did not allege in the petition that he actually suffered harassment as a result of the classification, he did claim in an inmate administrative remedy form that he had submitted to the department that the sex offender classification had the "potential" to prejudice prison staff and other inmates against him.[5] The habeas court dismissed the petition, concluding that because the petitioner failed to allege any protected liberty interest, the court lacked subject matter jurisdiction. Upon the habeas court's grant of certification to appeal, the petitioner appealed from the judgment of dismissal to the Appellate Court.

The Appellate Court first considered whether the petition had been rendered moot by the petitioner's release from prison prior to oral argument. *Anthony A.* v. *Commissioner of Correction*, supra, 159 Conn. App.

232–33. The court observed that the petitioner had informed the court that, after his release, he had been arrested in connection with new charges and was being detained at New Haven Correctional Center. Id., 232. Because of the petitioner's new arrest, the Appellate Court reasoned that there was "a reasonable possibility that, should he return to prison, he will again be classified as being in need of sex offender treatment because the department assigned him a sex offender treatment need score with a recommended sex offender treatment referral during his previous incarceration." Id., 234. The court concluded, therefore, that the collateral consequences exception to the mootness doctrine applied.[6] Id., 233.

Turning to the merits of the petitioner's claim, the Appellate Court reversed the judgment of the habeas court on the basis of its conclusion that the petitioner's allegations established a protected liberty interest under the stigma plus test applied by the federal courts, which it found to be appropriate under the facts of the present case. Id., 238–40. The court concluded that the petitioner's allegation that the department had falsely labeled him a sex offender established stigma, and that the petitioner's allegation that he had been coerced to participate in sex offender treatment on the basis of that erroneous classification established the "plus" element of the test. Id., 240–41. This certified appeal followed.

"In order to state a claim for a denial of procedural due process . . . a prisoner must allege that he possessed a protected liberty interest, and was not afforded the requisite process before being deprived of that liberty interest. . . . A petitioner has no right to due process . . . unless a liberty interest has been deprived . . . ." (Citations omitted; internal quotation marks omitted.) *Coleman* v. *Commissioner of Correction*, 111 Conn. App. 138, 141, 958 A.2d 790 (2008), cert. denied, 290 Conn. 905, 962 A.2d 793 (2009). Our first inquiry, therefore, is whether the petitioner has alleged a protected liberty interest. That question implicates the subject matter jurisdiction of the habeas court. See *Baker* v. *Commissioner of Correction*, 281 Conn. 241, 261–62, 914 A.2d 1034 (2007) (holding that habeas court lacked subject matter jurisdiction because inmate did not have cognizable liberty interest in parole eligibility status).

The parties disagree as to the applicable test to determine whether the petitioner's allegations are sufficient to establish that the respondent's actions implicated a protected liberty interest. The respondent, relying on this court's decision in *Wheway* v. *Warden*, 215 Conn. 418, 431, 576 A.2d 494 (1990), argues that because he enjoys full discretion in assigning classification and needs scores to inmates, such classifications cannot, as a matter of law, give rise to a protected liberty interest. The petitioner contends that because the classifica-

tion stigmatized him and because he suffered negative consequences, he has satisfied his burden of establishing a protected liberty interest under the stigma plus test. We agree with the petitioner that the stigma plus test applies under the circumstances of the case, and we conclude that his allegations sufficiently allege a protected liberty interest.

In *Sandin* v. *Conner*, 515 U.S. 472, 477–84, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995), the United States Supreme Court reviewed its earlier decisions that had considered under what circumstances allegations by inmates were sufficient to establish that state action had implicated a protected liberty interest. In the earliest case in that line of cases, *Morrissey* v. *Brewer*, 408 U.S. 471, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972), the court addressed whether the revocation of parole implicated a liberty interest. The court rejected the traditional view that the question turned on whether parole was a vested right or a privilege. Id., 481–82. The inquiry, the court stated, should instead center on both the weight of the loss and the nature of the interest implicated. Id., 481. That is, only state action that threatens to inflict a "grievous loss" to an interest that falls within the parameters of the " 'liberty or property' language of the [f]ourteenth [a]mendment" will trigger the right to procedural due process. Id., 481–82. Because revocation of parole satisfied both of those criteria, the court reasoned, it called for "some orderly process, however informal." Id., 482.

In its next decision addressing inmates' due process rights, the court shifted the inquiry away from the nature of the interest affected to the nature of the state action taken. In *Wolff* v. *McDonnell*, 418 U.S. 539, 554, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974), Nebraska inmates challenged disciplinary sanctions withholding good time credits. The applicable state statutes specified that good time credits were to "be forfeited *only for serious misbehavior*." (Emphasis added.) Id., 557. The court recognized that the due process clause does not *directly* guarantee a prisoner good time credits. Id. By expressly limiting the withholding of good time credits to instances of "major misconduct," however, Nebraska's statute had given rise to a "state-created" liberty interest that was protected by the due process clause. Id.

The court elaborated on both the grievous loss and state created liberty interest inquiries in *Meachum* v. *Fano*, 427 U.S. 215, 96 S. Ct. 2532, 49 L. Ed. 2d 451 (1976), in which the court rejected the prisoners' claim that a transfer to a Massachusetts prison with less favorable conditions implicated a protected liberty interest. The court acknowledged that the transfers had a "substantial adverse impact" on the prisoners. Id., 224. Whether the prisoners had suffered a grievous loss of liberty due to the transfers, however, must be understood in the context of their status as individuals who

have been incarcerated following a conviction. Because prisoners have already had their liberty greatly curtailed, such transfers do not constitute a *grievous* loss. Id. The court further observed that the federal constitution does not require a state to have more than one prison, nor does it guarantee placement in a particular prison. Id. The transfers, therefore, fell within the "normal limits or range of custody which the conviction has authorized the [s]tate to impose." Id., 225. If the court were to afford due process protection to *every* substantial deprivation suffered by prisoners, it reasoned, that would risk subjecting "to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." Id. As to whether a state statute had created a liberty interest, in dictum, the court relied on the broad discretion that Massachusetts prison officials had to transfer an inmate "for whatever reason or no reason at all" to reject the proposition that the prisoners had a state created due process right in avoiding the transfers. Id., 228. In contrast to the facts of *Wolff*, the court observed, there were no state laws that circumscribed that discretion or subjected it to any conditions. Id., 226.

The court's subsequent decisions had picked up on the theme sounded in the *Meachum* dictum, focusing the inquiry on the extent to which state laws had cabined the discretion of state actors. The court in *Sandin* viewed this line of cases as a digression from the proper inquiry—into the nature of the interest and the extent of the loss suffered—in favor of an unhelpful, "mechanical dichotomy" of mandatory versus discretionary decisions. *Sandin* v. *Connor*, supra, 515 U.S. 479. For example, in *Greenholtz* v. *Inmates of the Nebraska Penal & Correctional Complex*, 442 U.S. 1, 11–12, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979), the court concluded that the applicable state statute, which provided that the board of parole "shall" order a prisoner's release on parole "unless" it found one of four exceptions to be proven, created an "expectancy of release" in the inmates that gave rise to a liberty interest. The fixation on this dichotomy resulted in prisoners "comb[ing] regulations in search of mandatory language on which to base entitlements to various state-conferred privileges." *Sandin* v. *Connor*, supra, 481. Courts responded accordingly, centering their due process analyses entirely on the language of state statutes and regulations. Id.; see, e.g., *Hewitt* v. *Helms*, 459 U.S. 460, 468, 470–71, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983) (relying on mandatory language in state regulations to conclude that administrative segregation implicated protected liberty interest, despite also concluding that such confinement fell within conditions "ordinarily contemplated by a prison sentence"). This approach was particularly problematic in light of the fact that prison regulations, on which both litigants and the courts were relying to infer state

created rights, were not "designed to confer rights on inmates," but, rather, were "primarily designed to guide correctional officials in the administration of a prison." *Sandin* v. *Connor*, supra, 481–82. As a result, the mandatory versus discretionary approach to identifying inmates' liberty interests created a disincentive for states to enact regulations and encouraged courts to micromanage prisons. Id., 482.

*Sandin* represented the court's return to the original focus of the liberty interest inquiry—the nature of the interest involved and the extent of the loss suffered. The prisoner in *Sandin* alleged that being placed in administrative segregation for misconduct implicated his right to due process. Id., 476. The decision articulated two separate inquiries for determining whether a prisoner has alleged a protected liberty interest, either one created directly by the due process clause itself, or indirectly as a state created right. An independent federal constitutional interest is implicated when conditions are imposed on an inmate that "[exceed] the sentence in such an unexpected manner as to give rise to protection by the [d]ue [p]rocess [c]lause of its own force . . . ." Id., 484. State created constitutional interests are "limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id.

*Sandin* also acknowledged that, in "certain situations," a different inquiry is appropriate to determine whether the due process clause directly "confers a liberty interest" on inmates. Id., 479 n.4. Specifically, the court cited to its decision in *Vitek* v. *Jones*, 445 U.S. 480, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980), for the proposition that where a state action has " 'stigmatizing consequences' " for a prisoner and results in a punishment that is " 'qualitatively different' " from that "characteristically suffered by a person convicted of crime," the protected liberty interest arises from the due process clause directly. *Sandin* v. *Conner*, supra, 479 n.4. In *Vitek*, the court held that an inmate who had challenged his involuntary transfer to a mental hospital had a cognizable liberty interest in not being transferred to the hospital and subjected to mandatory psychiatric treatments without adequate due process. *Vitek* v. *Jones*, supra, 494. The court recognized that the stigma suffered by persons committed to a mental institution— as well as the accompanying, significant, negative social consequences—is indisputable. Id., 492. Involuntary commitment to a mental hospital, moreover, was "qualitatively different" from the punishments usually suffered by prisoners. Id., 493. The transfer, therefore "constituted a major change in the conditions of confinement amounting to a grievous loss . . . ."[7] (Internal quotation marks omitted.) Id., 488; see also id., 492.

Courts have referred to this third inquiry as the " 'stigma plus' " test. See, e.g., *Vega* v. *Lantz*, 596 F.3d

77, 81 (2d Cir. 2010). It does not appear that the prisoner in *Vitek* challenged the determination that he was mentally ill, and, accordingly, the court did not consider the veracity of that classification in concluding that he had alleged a protected liberty interest. We agree with the lower federal courts, however, that an inmate raising a due process claim pursuant to the stigma plus test in *Vitek* also must allege the falsehood of the stigmatizing label or classification.[8] Id. Under the facts of the present case—where the petitioner has alleged that he was stigmatized when the respondent wrongfully classified him as a sex offender, and alleges as the "plus" that he suffered various negative consequences, including being compelled to participate in treatment or risk forfeiting good time credits and parole eligibility—the stigma plus test is the best fit. Our inquiry, therefore, focuses on whether the allegations of the petition demonstrate that the classification was wrongful and stigmatized the petitioner, and that the consequences suffered by the petitioner were "qualitatively different" from the punishments usually suffered by prisoners, so that they constituted a major change in the conditions of confinement amounting to a grievous loss.

The federal courts of appeals have arrived at the same conclusion, applying the stigma plus test to determine whether a prisoner who challenges his allegedly wrongful classification as a sex offender has established a protected liberty interest. We agree with the federal courts that the first part of the test—whether it is stigmatizing to be classified as a sex offender—may be dispatched with ease and relatively little analysis. That classification is uniquely stigmatizing. As the United States Court of Appeals for the Ninth Circuit explained: "We can hardly conceive of a state's action bearing more stigmatizing consequences than the labeling of a prison inmate as a sex offender. . . . One need only look to the increasingly popular Megan's Laws, whereby states require sex offenders to register with law enforcement officials who are then authorized to release information about the sex offender to the public, to comprehend the stigmatizing consequences of being labeled a sex offender." (Footnote omitted; internal quotation marks omitted.) *Neal* v. *Shimoda*, 131 F.3d 818, 829 (9th Cir. 1997). As far as the petitioner's burden to demonstrate that the classification is wrongful, for purposes of jurisdiction, that requirement is satisfied by effective pleading and verified in a threshold inquiry—the petitioner simply must claim that the classification is false. At least one court has rejected a petitioner's claim on the basis that he failed to do so. See *Vega* v. *Lantz*, supra, 596 F.3d 77 (concluding that petitioner failed to establish threshold requirement of alleging that classification as sex offender was false). In the present case, the petitioner has satisfied this requirement by claiming that he did not sexually assault his wife and pointing to her retraction of her initial

statements to the contrary.

The weightier problem is resolving whether a prisoner's allegations have established the "plus" factor. A recent decision of the United States Supreme Court highlights the difficulty of determining what constitutes a qualitative difference or major change in the conditions of confinement amounting to a grievous loss. One cannot do so without reference to what constitutes "typical" or "ordinary" conditions of confinement for a prisoner. In *Wilkinson* v. *Austin*, 545 U.S. 209, 223–24, 125 S. Ct. 2384, 162 L. Ed. 2d 174 (2005), the court found that the extreme conditions experienced by prisoners placed in a super maximum security prison easily satisfied the "atypical and significant hardship" inquiry, an inquiry that is very similar to the "plus" portion of the stigma plus test. The court explained that "the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves *in relation to the ordinary incidents of prison life*." (Emphasis added; internal quotation marks omitted.) Id., 223. The extreme isolation and indeterminate length of confinement in a super maximum security facility, the court held, established a "*dramatic departure* from the basic conditions of [the inmate's] sentence." (Emphasis added; internal quotation marks omitted.) Id. What must be determined, the court explained, is the degree of departure from the "baseline." Id. The court in *Wilkinson* acknowledged that the lower federal courts have not arrived at a uniform method of determining what the baseline is, but declined to resolve the question because it was unnecessary, given the extreme nature of confinement in a super maximum security facility. Id.

The emphasis in *Wilkinson* on the need to first determine the baseline requires that our inquiry be a pragmatic one, aimed at determining the degree to which the conditions alleged by the petitioner depart from the expected norm of prison confinement. For that reason, although the Supreme Court expressly has stated that dichotomies such as mandatory/discretionary and rights/privileges are not determinative as to whether a petitioner has established a protected interest; *Sandin* v. *Connor*, supra, 515 U.S. 479; *Morrissey* v. *Brewer*, supra, 408 U.S. 483–84; such distinctions remain helpful to the extent that they are relevant to determining (1) what a prisoner ordinarily should expect from prison confinement, and (2) the degree to which particular conditions impose a hardship on a prisoner. For instance, in determining whether the refusal to consider an inmate eligible for parole or the denial of good time credits constitutes a major change in the conditions of confinement amounting to a grievous loss, it is relevant to consider the degree of discretion accorded to the officials making those decisions. The greater the discre-

tion, the more difficult it becomes to establish a departure from the norm. See, e.g., *Meachum* v. *Fano*, supra, 427 U.S. 226–27 (finding no protected liberty interest in avoiding transfer to maximum security prison because officials had broad discretion to transfer inmates and prisoners had no right to be in particular prison).

Federal courts have considered an inmate's allegation that he was compelled to participate in sex offender treatment sufficient to satisfy the "plus" factor. See, e.g., *Renchenski* v. *Williams*, 622 F.3d 315, 326–27 (3d Cir. 2010) (likening sex offender treatment program to forced transfer to mental institution in *Vitek*). Courts have found such treatment programs to be compulsory when the receipt of benefits, such as parole or good time credits, is conditioned on participation in treatment. See, e.g., *Coleman* v. *Dretke*, 395 F.3d 216, 222–23 (5th Cir. 2004) (conditioning parole on sex offender registration and treatment rendered facts of case "materially indistinguishable from *Vitek*"); *Kirby* v. *Siegelman*, 195 F.3d 1285, 1288, 1291–92 (11th Cir. 1999) (making sex offender therapy prerequisite for parole eligibility rendered therapy "compelled treatment" akin to "mandatory behavior modification" programs at issue in *Vitek*); *Chambers* v. *Colorado Dept. of Corrections*, 205 F.3d 1237, 1239–41 (10th Cir.) (reduction of good time credits for failure to participate in sex offender therapy was "coercive consequence" establishing "plus" factor), cert. denied, 531 U.S. 974, 121 S. Ct. 419, 148 L. Ed. 2d 323 (2000). Courts have held to this rule notwithstanding the representations of prison officials that participation in sex offender treatment is voluntary. Rather than rely on such characterizations, courts consistently have looked to whether significant negative consequences flowed from failure to participate in a "recommended" treatment program. See, e.g., *Neal* v. *Shimoda*, supra, 131 F. 3d 822, 829 (rejecting claim by prison officials that participation in treatment was merely recommendation and voluntary, where treatment was condition of parole eligibility). By contrast, courts have found no protected liberty interest where an inmate has been labeled a sex offender and provided with a recommendation for sex offender treatment, but has been unable to demonstrate that he suffered any negative consequences for failure to participate in treatment. See *Toney* v. *Owens*, 779 F.3d 330, 340–41 (5th Cir. 2015).[9]

Connecticut law is not to the contrary. Although this court has addressed inmates' claims that state action implicated a protected liberty interest, this appeal presents the first instance in which we are called upon to apply the stigma plus test in resolving that question. In fact, the two instances in which this court has considered the question of whether the actions of prison officials gave rise to a protected liberty interest, the court resolved the issue by relying on authority that predated and was disapproved by *Sandin*. Those cases, there-

fore, are not controlling. Specifically, in *Baker* v. *Commissioner of Correction*, supra, 281 Conn. 243, we rejected the petitioner's claim that he had been denied parole eligibility status on the basis of his improper classification as a violent offender, concluding that Connecticut's statutory scheme does not create a cognizable liberty interest in parole eligibility status. The court in *Baker* restricted its discussion, however, to state created rights decisions that the United States Supreme Court subsequently criticized in *Sandin.* Id., 253–54. The court in *Baker* did not discuss *Sandin,* and it does not appear that the petitioner claimed that he was stigmatized by the classification. Earlier, in *Wheway* v. *Warden,* supra, 215 Conn. 423, this court addressed the question of whether an inmate's classification as a maximum security prisoner solely on the basis of a parole violation detainer implicated a protected liberty interest. *Wheway* was decided well before *Sandin.* In concluding that the prisoner had no protected liberty interest in his classification, the court in *Wheway* relied exclusively on the level of discretion enjoyed by prison officials in making the classification determination; id., 431; an approach that was subsequently criticized in *Sandin. Sandin* v. *Connor,* supra, 515 U.S. 479.

Turning to the petitioner's allegations, which we have noted must be accepted as true, we conclude that they are sufficient to allege a protected liberty interest, thus invoking the jurisdiction of the habeas court. The petitioner alleged that he was classified as a sex offender, and that he was required to participate in sex offender treatment, or risk forfeiting parole eligibility, community release, and good time credits. These allegations are precisely of the type that the majority of the courts of appeals have found to be sufficient to allege a protected liberty interest, such that a hearing now may proceed on the merits. See, e.g., *Coleman* v. *Dretke,* supra, 395 F.3d 222–23. The allegations are sufficient to invoke the jurisdiction of the habeas court.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

* In accordance with our policy of protecting the privacy interests of victims of sexual assault, we decline to identify the alleged victim or others through whom her identity may be ascertained. See General Statutes § 54-86e.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

[1] We granted the respondent's petition for certification to appeal, limited to the following question: "Did the Appellate Court correctly reverse the trial court's judgment based on its determination that the trial court improperly held that it lacked jurisdiction over the petitioner's habeas petition challenging his prison classification of sexual treatment needs?" *Anthony A.* v. *Commissioner of Correction,* 319 Conn. 934, 125 A.3d 208 (2015).

[2] On appeal, the respondent now seeks to dispute the facts as alleged in the petition. For example, the respondent argues in his brief to this court that the petitioner was merely assigned a " 'sexual needs treatment score,' " which the respondent contends is not the equivalent of labeling the petitioner a sex offender. Even if we were not required on appeal to take the facts as alleged in the petition for purposes of determining whether the court had jurisdiction, the respondent waived this claim at the hearing on the petition.

At that time, the respondent had the opportunity to contest the petitioner's allegation that he had been labeled a sex offender. The respondent failed to do so. Specifically, during the hearing, the court asked the respondent whether he had any objection to the court taking the facts from the allegations in the petition for the purpose of determining whether the petitioner had alleged a cognizable liberty interest, and the respondent answered: "No objection, Your Honor." Later, the court stated: "I'm prepared to rule on this matter and in my ruling I'm going to assume for purposes of this ruling that the factual allegations by [the petitioner] are correct, in that he has been classified as a sex offender when he was not really a sex offender." At that point, the respondent could have disputed the petitioner's allegation that the respondent had classified him as a sex offender, but he elected not to do so. Therefore, the respondent effectively has waived—at least for purposes of determining whether the court has jurisdiction—any disputes he may have as to the facts alleged in the petition.

[3] For the risk assessment, the following factors are considered: "(1) [h]istory of escape; (2) [s]everity/violence of the current offense; (3) [h]istory of violence; (4) [l]ength of sentence; (5) [p]resence of pending charges, bond amount and/or detainers; (6) [d]iscipline history; and, (7) [s]ecurity [r]isk [g]roup membership." Administrative Directive 9.2 (8) (A).

For the needs assessment, the following factors are considered: "(1) [m]edical and health care; (2) [m]ental health care; (3) [e]ducation; (4) [v]ocational training and work skills; (5) [s]ubstance abuse treatment; (6) [s]ex offender treatment; and, (7) [c]ommunity resources." Administrative Directive 9.2 (8) (B).

[4] It appears that, on July 7, 2012, a hearing was held to determine the petitioner's classification. The petitioner represents that he was not present at the hearing, as was his right pursuant to the department's Objective Classification Manual, and was informed of his classification as a sex offender only after the issue had been resolved.

[5] In his trial brief, the petitioner claimed that he had been ostracized and harassed as a result of the erroneous classification. He conceded, however, that he could not prove that he had been harassed.

[6] The petitioner's current status is not clear from the record. That is, the record does not reveal whether the petitioner was convicted of the new charges, and, if so, whether he was sentenced to a term of incarceration and once again classified as a sex offender. It remains possible, however, that the respondent could, if the petitioner is again incarcerated, classify him as a sex offender because the previous classification establishes that he now has a prior history as an alleged sex offender. Accordingly, we agree with the Appellate Court that the collateral consequences exception to the mootness doctrine applies.

[7] The court also concluded that the relevant Nebraska statutes had given rise to a state created liberty interest. *Vitek* v. *Jones*, supra, 445 U.S. 488–91. That analysis is not relevant to the present case.

[8] Those courts have imported that requirement from *Paul* v. *Davis*, 424 U.S. 693, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976), in which the court first set forth the stigma plus test, albeit in a different context. See, e.g., *Vega* v. *Lantz*, supra, 596 F.3d 81 (citing to decisions, including *Paul*, for proposition that "[t]o establish a stigma plus claim, a plaintiff must show (1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is *capable of being proved false, and that he or she claims is false*, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." [Emphasis added; internal quotation marks omitted.])

In *Paul*, an individual's name and photograph appeared on a law enforcement flyer that was captioned " 'Active Shoplifters' " and distributed by the police to local retailers. *Paul* v. *Davis*, supra, 695. The court, holding that the individual's due process claim against the police was not cognizable, explained that an individual alleging defamation type claims against public officials must prove not only stigma, but also the "plus," i.e., that a "right or status previously recognized by state law was distinctly altered or extinguished" in connection with the alleged defamation. Id., 711–12. Because the case arose in the defamation context, litigants asserting a stigma plus claim pursuant to *Paul* have been required to allege the falsity of the governmental statements or classifications. See, e.g., *O'Connor* v. *Pierson*, 426 F.3d 187, 195 (2d Cir. 2005) (requiring plaintiff to allege government action imposing tangible and material burden, in connection with *false* statement that damaged reputation).

[9] The only court of appeals that has arrived at the opposite conclusion is the United States Court of Appeals for the Seventh Circuit, which, in *Grennier* v.

*Frank*, 453 F.3d 442, 446 (7th Cir. 2006), rejected a claim by a Wisconsin inmate that his wrongful classification as a sex offender, taken together with the conditioning of parole eligibility on his participation in a sexual disorder treatment program, implicated a protected liberty interest. Although the inmate's claim set forth a classic stigma plus claim, the court concluded that no protected liberty interest was implicated because parole for inmates serving life sentences in Wisconsin is wholly discretionary, as compared to inmates with fixed terms, who are presumptively entitled to parole after serving two-thirds of their sentences. Id., 444. *Grennier*, however, relies primarily on the line of cases; id., 444, 446; that *Sandin* expressly criticized as establishing a "mechanical dichotomy" of mandatory versus discretionary decisions. *Sandin* v. *Connor*, supra, 515 U.S. 479.

---