******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# DAVID TAYLOR *v.* COMMISSIONER OF CORRECTION
## (AC 44665)

Prescott, Suarez and Bishop, Js.

*Syllabus*

The petitioner, a citizen of the United Kingdom who had been convicted of murder, sought a writ of habeas corpus, claiming, inter alia, that his constitutional rights to procedural due process and equal protection were violated when the respondent Commissioner of Correction assigned a certain risk level to him, classified him as a public safety risk and limited his access to certain prison rehabilitative programs and other services. The habeas court dismissed the petition, concluding that it lacked subject matter jurisdiction over the petitioner's claims. On the granting of certification, the petitioner appealed to this court. *Held*:

1. The habeas court properly dismissed the habeas petition with respect to the petitioner's procedural due process claim, the petitioner having failed to sufficiently allege, under the stigma plus test, a cognizable liberty interest over which the court had subject matter jurisdiction; contrary to the petitioner's contention that being assigned a certain risk level and classified as a public safety risk satisfied the stigma portion of the stigma plus test, he failed to sufficiently allege facts that, if taken as true, established stigma, as it appeared that the respondent was mindful that the petitioner was a British citizen subject to deportation upon completion of his sentence, and it was likely that his conviction of murder itself was the source of any stigma of being a public safety risk.

2. The habeas court improperly dismissed the petitioner's equal protection claim, in which he sufficiently alleged that he was treated differently from similarly situated prisoners because of his alienage and British citizenship; in the present case, because the habeas petition alleged that the respondent denied the petitioner access to rehabilitative programs and other services that were available to inmates who are United States citizens, the petitioner sufficiently alleged a cognizable violation of his right to equal protection, and, as alienage and national origin are suspect classifications, he sufficiently pleaded that the applicable statutes (§§ 18-81w, 18-81x and 18-81z), as applied, burdened a suspect class of persons, notwithstanding the respondent's narrow interpretation of the habeas petition as asserting a class of one claim.

3. The habeas court improperly dismissed the petitioner's claim that he was subjected to cruel and unusual punishment as a result of the respondent's management of the COVID-19 virus at the correctional facility in which the petitioner was incarcerated; the petitioner sufficiently pleaded that the COVID-19 virus and the conditions of his confinement put his life at risk because of his preexisting medical conditions and that the respondent was deliberately indifferent to and disregarded that risk because social distancing and the use of personal protective equipment were not enforced among inmates or prison staff.

Argued May 10—officially released November 22, 2022

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland, where the court, *Bhatt, J.*, granted the respondent's motion to dismiss the petition and rendered judgment thereon, from which the petitioner, on the granting of certification, appealed to this court; thereafter, the court, *Bhatt, J.*, issued an articulation of its decision. *Reversed in part*; *further proceedings*.

*Alexander T. Taubes*, assigned counsel, for the appellant (petitioner).

*Zenobia G. Graham-Days*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Clare Kindall*, solicitor general, for the appellee (respondent).

*Opinion*

BISHOP, J. The petitioner, David Taylor,[1] appeals from the judgment of the habeas court dismissing his second amended petition for a writ of habeas corpus pursuant to Practice Book § 23-29 (2) and (5).[2] On appeal, the petitioner claims that the court incorrectly dismissed his claims that the respondent, the Commissioner of Correction, violated his constitutional rights to (1) procedural due process, (2) equal protection of the law, and (3) freedom from cruel and unusual punishment. We disagree that the court improperly dismissed the petitioner's first claim. We agree, however, that the court improperly dismissed his second and third claims. We therefore affirm, in part, and reverse, in part, the judgment of the habeas court and remand the case for further proceedings consistent with this opinion.

The following procedural history and facts, as alleged in the petitioner's second amended petition (operative petition),[3] or as otherwise undisputed in the record, are relevant to this appeal.[4] The petitioner, a citizen of the United Kingdom, is currently incarcerated at the Osborn Correctional Institution (Osborn) in Somers, serving a term of twenty-five years of incarceration for the crime of murder. In his operative petition, the petitioner asserts, in essence, three claims.

The first claim asserts that the respondent violated the petitioner's right to procedural due process. According to the petition, the respondent assigned the petitioner an overall risk score of three and a detainer score of three.[5] The respondent also labeled the petitioner "a public safety risk." An Immigration and Naturalization Service and Immigration and Customs Enforcement detainer[6] was issued against the petitioner in 2010. As a result of this detainer, the petitioner faces deportation upon the completion of his sentence. The petitioner alleges that, by classifying him as "a public safety risk" and improperly assigning him a detainer score of three, the respondent has violated his right to procedural due process. Specifically, the petitioner contends that those classifications are false, stigmatizing, and result in punishment that is qualitatively different from that characteristically suffered by a person convicted of a crime. According to the petitioner, because he has been improperly classified, he has been denied rehabilitative programs, and his reputation has been, and will continued to be, injured.

The petitioner's second claim asserts an equal protection violation.[7] The petitioner claims that he is being denied equal protection of the laws because the respondent has limited his access to rehabilitative programs that are available to all inmates pursuant to General Statutes §§ 18-81w,[8] 18-81x[9] and 18-81z[10]—including reentry and discharge planning, and community release—because he is a British citizen.

The petitioner's third claim asserts that the respondent has violated his right under the eighth amendment to be free from cruel and unusual punishment. The petitioner, who is almost sixty-seven years old, alleges that the COVID-19 virus poses a sufficiently and objectively serious risk to his life because the virus has been particularly deadly for institutionalized populations and because he has numerous preexisting medical conditions. The petitioner further alleges that the respondent has acted with deliberate indifference toward him by failing to follow Centers for Disease Control and Prevention (CDC) guidelines—specifically, by failing to enforce mask wearing and social distancing.[11]

In his prayer for relief, the petitioner "ask[ed] the court to order the commissioner to:

"(1) Reduce [his] detainer score to a 1 and [his] overall score to a 2, which would make [him] eligible for community release and other relevant programs.

"(2) Grant [him], as a low risk offender, and future deportee with over 85 [percent] of [his] sentence served, with a positive institutional record, community release here or in the [United Kingdom] under [General Statutes] § 18-91a, because of [his] deteriorating health, age, and high risk for COVID-19 with complications.

"(3) [Afford him] [a]ny other relief the court deems just and proper under the circumstances."

On September 14, 2020, the respondent filed a motion to dismiss the petition pursuant to Practice Book § 23-29 (1), (2) and (5).[12] In his memorandum of law in support of the motion, the respondent claimed that the court lacked subject matter jurisdiction over the petition because the petitioner did not have a protected liberty interest in a certain classification and because the petition failed to state a claim on which habeas relief could be granted.[13] On October 16, 2020, the petitioner filed an objection to the respondent's motion to dismiss in which he argued that the court had subject matter jurisdiction over his petition because he sufficiently had alleged that the respondent had violated his rights to procedural due process, equal protection, and freedom from cruel and unusual punishment. On December 8, 2020, a virtual hearing on the respondent's motion to dismiss was held.

On January 19, 2021, the court issued a memorandum of decision in which it dismissed, pursuant to Practice Book § 23-29 (2) and (5), the entirety of the operative petition.[14] On January 27, 2021, the petitioner filed a petition for certification to appeal, which the court granted. On February 16, 2021, the petitioner filed a motion to reargue, which the court denied on February 17, 2021. This appeal followed.[15]

Before turning to the petitioner's claims, we first set forth the relevant standard of review and legal princi-

ples that guide our analysis. "The principal purpose of the writ of habeas corpus is to serve as a bulwark against convictions that violate fundamental fairness. . . . In order to invoke the trial court's subject matter jurisdiction in a habeas action, a petitioner must allege that he is illegally confined or has been deprived of his liberty." (Internal quotation marks omitted.) *Byrd* v. *Commissioner of Correction*, 177 Conn. App. 71, 82, 171 A.3d 1103 (2017).

"[I]t is the established policy of the Connecticut courts to be solicitous of pro se litigants and when it does not interfere with the rights of other parties to construe the rules of practice liberally in favor of the pro se party. . . . However, [t]he petition for a writ of habeas corpus is essentially a pleading and, as such, it should conform generally to a complaint in a civil action. . . . The principle that a plaintiff may rely only upon what he has alleged is basic. . . . It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of his complaint. . . . While the habeas court has considerable discretion to frame a remedy that is commensurate with the scope of the established constitutional violations . . . it does not have the discretion to look beyond the pleadings . . . to decide claims not raised." (Citation omitted; internal quotation marks omitted.) *Vitale* v. *Commissioner of Correction*, 178 Conn. App. 844, 850–51, 178 A.3d 418 (2017), cert. denied, 328 Conn. 923, 181 A.3d 566 (2018).

To the extent the respondent claims that the petition is legally insufficient, our review requires us to interpret the pleadings. The interpretation of pleadings involves an assessment of whether they are legally sufficient, and, therefore, our review is plenary. See, e.g., *Woods* v. *Commissioner of Correction*, 197 Conn. App. 597, 607, 232 A.3d 63 (2020) ("[T]he interpretation of pleadings is always a question of law for the court . . . . Our review of the [habeas] court's interpretation of the pleadings therefore is plenary. . . . [T]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . [T]he [petition] must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties. . . . As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the [petition] is insufficient to allow recovery." (Emphasis omitted; internal quotation marks omitted.)), appeal dismissed, 341 Conn. 506, 267 A.3d 193 (2021).

Practice Book § 23-29, which governs motions to dismiss habeas petitions, "serves, roughly speaking, as the analog to Practice Book §§ 10-30 and 10-39, which, respectively, govern motions to dismiss and motions to

strike in civil actions." *Gilchrist* v. *Commissioner of Correction*, 334 Conn. 548, 561, 223 A.3d 368 (2020). "[A]s it would do in evaluating the allegations in a civil complaint, in evaluating the legal sufficiency of allegations in a habeas petition, a court must view the allegations in the light most favorable to the petitioner, which includes all facts necessarily implied from the allegations." *Finney* v. *Commissioner of Correction*, 207 Conn. App. 133, 142, 261 A.3d 778, cert. denied, 339 Conn. 915, 262 A.3d 134 (2021).

"Whether a habeas court properly dismissed [the operative petition] for a writ of habeas corpus presents a question of law over which our review is plenary." *Gilchrist* v. *Commissioner of Correction*, supra, 334 Conn. 553. We therefore must "decide whether the court's conclusions are legally and logically correct and supported by the facts in the record." (Internal quotation marks omitted.) *Boria* v. *Commissioner of Correction*, 186 Conn. App. 332, 342, 199 A.3d 1127 (2018), rev'd on other grounds, 345 Conn. 39, 282 A.3d 433 (2022).

I

The petitioner first claims that the court improperly dismissed his petition for a writ of habeas corpus because the allegations within his petition regarding his classification status established the denial of a protected liberty interest without due process. Specifically, the petitioner contends that the petition's allegations sufficiently alleged a claim under the stigma plus test, and, therefore, sufficiently alleged a cognizable liberty interest invoking the subject matter jurisdiction of the court. We are unpersuaded.

We first set forth the legal principles underlying our determination of the petitioner's first claim. "In order to state a claim for a denial of procedural due process . . . a prisoner must allege that he possessed a protected liberty interest, and was not afforded the requisite process before being deprived of that liberty interest. . . . A petitioner has no right to due process . . . unless a liberty interest has been deprived . . . . Our first inquiry, therefore, is whether the petitioner has alleged a protected liberty interest. That question implicates the subject matter jurisdiction of the habeas court." (Citation omitted; internal quotation marks omitted.) *Anthony A.* v. *Commissioner of Correction*, supra, 326 Conn. 674–75.

In *Anthony A.*, our Supreme Court adopted the stigma plus test used by federal courts to determine whether the petitioner had alleged a cognizable liberty interest in a prison classification.[16] Id., 680–81. In that case, the petitioner sought a writ of habeas corpus, claiming that the Department of Correction (department) improperly had classified him as a sex offender without providing him with procedural due process. Id., 672. Our Supreme

Court observed that, "in certain situations, a different inquiry is appropriate to determine whether the due process clause directly confers a liberty interest on inmates." (Internal quotation marks omitted.) Id., 679. "Specifically . . . where a state action has stigmatizing consequences for a prisoner and results in a punishment that is qualitatively different from that characteristically suffered by a person convicted of crime, the protected liberty interest arises from the due process clause directly." (Citation omitted; internal quotation marks omitted.) Id. The court explained that "an inmate raising a due process claim pursuant to the stigma plus test . . . also must allege the falsehood of the stigmatizing label or classification." Id., 680.

The court in *Anthony A.* determined that the stigma plus test was applicable in the case before it, in which the petitioner had "alleged that he was stigmatized when the respondent wrongfully classified him as a sex offender, and allege[d] as the 'plus' that he suffered various negative consequences, including being compelled to participate in treatment or risk forfeiting good time credits and parole eligibility . . . ." Id. Thus, the court continued, its inquiry "focuse[d] on whether the allegations of the petition demonstrate[d] that the classification was wrongful and stigmatized the petitioner, and that the consequences suffered by the petitioner were 'qualitatively different' from the punishments usually suffered by prisoners, so that they constituted a major change in the conditions of confinement amounting to a grievous loss." Id., 680–81. The court determined that the petitioner sufficiently had alleged a claim under the stigma plus test and, thus, sufficiently had alleged a protected liberty interest to invoke the habeas court's subject matter jurisdiction. Id., 686.

Accordingly, to plead a stigma plus claim, a petitioner must allege facts demonstrating that a "classification was wrongful and stigmatized the petitioner, and that the consequences suffered by the petitioner were 'qualitatively different' from the punishments usually suffered by prisoners, so that they constituted a major change in the conditions of confinement amounting to a grievous loss." Id., 681.

Following *Anthony A.*, this court has held that the stigma plus test was satisfied only where, like in *Anthony A.*, a petitioner improperly was classified as a sex offender. Compare *Carolina* v. *Commissioner of Correction*, 192 Conn. App. 296, 302, 217 A.3d 1068 (petitioner sufficiently alleged protected liberty interest under stigma plus test because he was classified as sex offender, which court determined implicated liberty interest), cert. denied, 334 Conn. 909, 221 A.3d 43 (2019), with *Vitale* v. *Commissioner of Correction*, supra, 178 Conn. App. 870–71 (petition failed to sufficiently allege stigma plus claim because petition did not allege classification as sex offender was false and because labeling

inmate as sex offender and providing recommendation for treatment, in absence of negative consequences for failure to participate in such treatment, was insufficient to show consequences petitioner suffered were qualitatively different from punishments usually suffered by prisoners), and *Stephenson* v. *Commissioner of Correction*, 203 Conn. App. 314, 327–31, 248 A.3d 34 (petition failed to sufficiently allege stigma plus claim where crux of petition constituted attempt by petitioner to advance his parole eligibility and where petition did not identify consequences qualitatively different from punishments usually suffered by prisoners), cert. denied, 336 Conn. 944, 249 A.3d 737 (2021).

In the present case, the petitioner contends that being classified as a "public safety risk" and being assigned a certain classification score is sufficient to satisfy the "stigma" portion of the stigma plus test because these classifications injure his reputation. The petitioner alleged, in his operative petition, that the classifications placed on him by the respondent ensure that he will be known as a public safety risk in the United Kingdom for years to come, which, according to the petitioner, will potentially have negative effects on him and his family, including potentially "disenfranchising" him and "making [him] a ward of the state . . . ."

Although the petitioner alleges that the classifications are stigmatizing and will result in harm to his reputation, he fails to sufficiently allege that these classifications are "uniquely stigmatizing" or akin to being classified as a sex offender. See *Anthony A.* v. *Commissioner of Correction*, supra, 326 Conn. 681 ("[T]he first part of the test—whether it is stigmatizing to be classified as a sex offender—may be dispatched with ease and relatively little analysis. That classification is uniquely stigmatizing. . . . We can hardly conceive of a state's action bearing more stigmatizing consequences than the labeling of a prison inmate as a sex offender. . . . One need only look to the increasingly popular Megan's Laws, whereby states require sex offenders to register with law enforcement officials who are then authorized to release information about the sex offender to the public, to comprehend the stigmatizing consequences of being labeled a sex offender." (Internal quotation marks omitted.)); see also *Carolina* v. *Commissioner of Correction*, supra, 192 Conn. App. 301 ("classification as a sex offender is 'uniquely stigmatizing' "); id., 301 n.6 ("[c]onstitutional privacy interests are implicated . . . because . . . [t]he damage to [citizens'] reputations resulting from [disclosure] stigmatizes them as currently dangerous sex offenders, can harm their earning capacities, and can cause them to be objects of derision in the community" (internal quotation marks omitted)).[17] Here, it appears that the respondent assigned a risk level to the petitioner, mindful that he is a British citizen subject to deportation once his sentence is complete. We do not believe that such action

facially meets the stigma plus test. We also do not believe that the respondent's labeling of the petitioner as "a public safety risk" is sufficient to constitute stigma. Indeed, given that the petitioner was convicted of murder, it is likely that his conviction itself, rather than any assessment of a risk level, is the source of any stigma of being "a public safety risk." Accordingly, we conclude that the petitioner has failed to allege facts, which, if taken as true, establish "stigma" under the stigma plus test.[18] Therefore, with respect to the petitioner's procedural due process claim, he has not sufficiently alleged a cognizable liberty interest over which the habeas court had subject matter jurisdiction, and the habeas court properly dismissed the petition with respect to this claim.

II

The petitioner next asserts that the court improperly dismissed his equal protection claim. The petitioner argues that his petition sufficiently alleges that he has been treated differently from similarly situated prisoners because of his alienage and national origin, namely, because he is a British citizen. Specifically, the petitioner contends that he has sufficiently alleged that he has been denied rehabilitative programs, reentry services, discharge planning, and community release because he is not a citizen of the United States.

In response, the respondent interprets the petition as asserting a "class of one" equal protection claim because the petition does not allege membership in a protected class. The respondent also asserts that the petition fails to "allege facts showing a reasonably close resemblance between [himself] and a proffered comparator." (Internal quotation marks omitted.) See *Hsin* v. *City of New York*, 779 Fed. Appx. 12, 15 (2d Cir. 2019). The respondent further contends that the petition does not allege that the petitioner was treated differently because of his British citizenship or alienage. We do not read the petition so narrowly. We understand the petition to allege disparate treatment on the basis of his alienage and national origin and, thus, to allege membership in a protected class. We therefore do not construe the petitioner's equal protection claim as a "class of one" claim.

"The equal protection clause of the fourteenth amendment to the United States constitution, § 1, provides in relevant part: No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." (Internal quotation marks omitted.) *Hunter* v. *Commissioner of Correction*, 271 Conn. 856, 862 n.7, 860 A.2d 700 (2004). "The Equal Protection Clause of the [f]ourteenth [a]mendment to the United States [c]onstitution is essentially a direction that all persons similarly situated should be treated alike. . . . Conversely, the equal protection clause places no restrictions on the state's

authority to treat dissimilar persons in a dissimilar manner. . . . Thus, [t]o implicate the equal protection [clause] . . . it is necessary that the state statute [or statutory scheme] in question, either on its face or in practice, treat persons standing in the same relation to it differently. . . . [Consequently], the analytical predicate [of consideration of an equal protection claim] is a determination of who are the persons [purporting to be] similarly situated. . . . The similarly situated inquiry focuses on whether the [petitioner is] similarly situated to another group for purposes of the challenged government action. . . . Thus, [t]his initial inquiry is not whether persons are similarly situated for all purposes, but whether they are similarly situated for purposes of the law challenged." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Stuart* v. *Commissioner of Correction*, 266 Conn. 596, 601–602, 834 A.2d 52 (2003).

After this initial inquiry, the court "must . . . determine the standard by which the challenged statute's constitutional validity will be determined. If, in distinguishing between classes, the statute either intrudes on the exercise of a fundamental right or burdens a suspect class of persons, the court will apply a strict scrutiny standard [under which] the state must demonstrate that the challenged statute is necessary to the achievement of a compelling state interest. . . . If the statute does not touch upon either a fundamental right or a suspect class, its classification need only be rationally related to some legitimate government purpose in order to withstand an equal protection challenge." (Footnote omitted; internal quotation marks omitted.) *Hammond* v. *Commissioner of Correction*, 259 Conn. 855, 877, 792 A.2d 774 (2002). "Although the federal constitution does not expressly enumerate any suspect classes, the United States Supreme Court has identified three such classifications, namely, race, alienage and national origin." *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 159, 957 A.2d 407 (2008).

"[A]n equal protection claim based on unequal application of the law . . . must be established by . . . showing . . . intentional or purposeful discrimination." (Internal quotation marks omitted.) *Tuchman* v. *State*, 89 Conn. App. 745, 759, 878 A.2d 384, cert. denied, 275 Conn. 920, 883 A.2d 1252 (2005). "[T]he plaintiff must prove that the state discriminated against him based on an impermissible, invidious classification. . . . Therefore, the plaintiff must prove that the action had a discriminatory effect and that it was motivated by a discriminatory purpose. . . . Put another way, the plaintiff must establish that he, compared with others similarly situated, was selectively treated . . . and . . . that such selective treatment was based on impermissible considerations . . . ." (Citations omitted; internal quotation marks omitted.) *DiMartino* v. *Richens*, 263 Conn. 639, 673, 822 A.2d 205 (2003); see also

*Hunt* v. *Prior*, 236 Conn. 421, 443, 673 A.2d 514 (1996) ("[w]hen, as here, a claimed equal protection violation arises from the alleged selective application of a facially neutral state [law], it must be shown that (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations" (internal quotation marks omitted)).

In the present case, we conclude that the petitioner has alleged sufficient facts, when properly construed in the light most favorable to him, to constitute an equal protection claim. The crux of the petitioner's claim is that the respondent has limited his access to rehabilitative programs, including reentry and discharge planning, and community release—programs he alleges are available to inmates who are United States citizens— because he is a British citizen.

When construed broadly and realistically, the petition asserts that §§ 18-81w, 18-81x and 18-81z, as applied by the respondent, violate the petitioner's right to equal protection of the law.[19] The petitioner alleges that he is similarly situated to inmates who are citizens of the United States. The petitioner pleads that, although he is similarly situated to inmates who are citizens of the United States, unlike those inmates, he has been denied access to rehabilitative programs because he is a citizen of the United Kingdom.

The petition also sufficiently alleges that §§ 18-81w, 18-81x and 18-81z, as applied, burden him as a member of a suspect class of persons. In particular, the petition alleges that the statutes burden him because he is not a United States citizen. According to the petitioner, he has been "denied equal protection of the laws as a British citizen." Because alienage and national origin are suspect classifications; see *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 159; we conclude that the petition sufficiently pleads that the statutes, as applied, burden a suspect class of persons. See *Hammond* v. *Commissioner of Correction*, supra, 259 Conn. 877.

Last, the petition, read in its entirety and broadly construed, asserts that the respondent, by denying the petitioner access to rehabilitative programs, intentionally and purposefully discriminated against him based on his alienage and national origin.[20] Specifically, the petitioner avers that he has completed only six programs during his incarceration, despite requesting more, and has been told that he does not need further programs. The petitioner claims that the respondent "will provide no reentry and discharge planning," and alleges in the habeas petition that the respondent is "illegally using [the] detainer to limit [his] access to rehabilitative programs, including reentry, discharge planning, and community release."[21] The petition fur-

ther states that the respondent "has chosen to hinder the limited chances [the petitioner] already [has] to reintegrate into [his] own community after twenty-seven years absence, and [that this] is completely antithetical to the purpose of modern corrections." (Internal quotation marks omitted.) According to the petition, the respondent is "set on punishing [the petitioner] further when [he] return[s] to England."

The petition, read in its entirety, and construed broadly and realistically, rather than narrowly and technically, sufficiently alleges a cognizable violation of the petitioner's right to equal protection. We therefore conclude that the court improperly dismissed this claim on the basis of Practice Book § 23-29 (2) and (5).

### III

The petitioner next claims that the court improperly dismissed his petition because it did not sufficiently allege a valid cruel and unusual punishment claim. Specifically, the petitioner contends that the petition adequately stated a claim of cruel and unusual punishment based on the serious risk that COVID-19 poses to his health and the respondent's deliberate indifference to that risk.[22] We agree with the petitioner that the court improperly dismissed this claim, as we believe that he sufficiently alleged facts to support this constitutional claim.

"The [c]onstitution does not mandate comfortable prisons . . . but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the [e]ighth [a]mendment. . . . The [a]mendment also imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates . . . .

"In *Estelle* v. *Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976), the United States Supreme Court concluded: [D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . proscribed by the [e]ighth [a]mendment. . . .

"These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. . . . In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. . . . The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that

it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself. . . .

"A prisoner seeking habeas relief on the basis of his conditions of confinement, which includes the medical care made available to him, bears the burden of establishing both aspects of his claim." (Internal quotation marks omitted.) *Jolley* v. *Commissioner of Correction*, 98 Conn. App. 597, 599–600, 910 A.2d 982 (2006), cert. denied, 282 Conn. 904, 920 A.2d 308 (2007). "In order to establish an [e]ighth [a]mendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs. . . . The standard of deliberate indifference includes both subjective and objective components. First, the alleged deprivation must be, in objective terms, sufficiently serious. . . . Second, the [government official] must act with a sufficiently culpable state of mind. . . . An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . Thus, an official's failure to alleviate a significant risk that he should have perceived but did not [does not violate the eighth amendment]. . . .

"Accordingly, to establish a claim of deliberate indifference in violation of the eighth amendment, a prisoner must prove that the officials' actions constituted more than ordinary lack of due care for the prisoner's interests or safety. . . . [D]eliberate indifference is a stringent standard of fault . . . requiring proof of a state of mind that is the equivalent of criminal recklessness." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Faraday* v. *Commissioner of Correction*, 288 Conn. 326, 338–39, 952 A.2d 764 (2008). In other words, "the evidence must show that the respondent had actual knowledge of a substantial risk of serious harm facing the petitioner and disregarded that risk by failing to take reasonable measures to abate that risk." *Fuller* v. *Commissioner of Correction*, 75 Conn. App. 133, 137, 815 A.2d 208 (2003).

In the present case, we conclude that the petitioner has alleged sufficient facts, if properly construed in the light most favorable to him, to constitute a claim of cruel and unusual punishment in violation of his eighth amendment right and to thus invoke the subject matter jurisdiction of the habeas court because the gravamen of the petitioner's claim concerns the transmission of the COVID-19 virus, the adequacy of the preventative measures instituted by the respondent, and the serious risk to health attendant to the respondent's management of the virus as it applies to the petitioner's particular circumstances.

As to the first prong—a sufficiently serious deprivation—the petitioner alleged that the COVID-19 pandemic was a "seriously precarious situation," and has "wreaked havoc across the world and has been particularly deadly for institutionalized populations." This court previously has recognized the seriousness of the COVID-19 virus. See *Gonzalez* v. *Commissioner of Correction*, 211 Conn. App. 632, 646 n.9, 273 A.3d 252 ("[B]ecause incarcerated inmates are necessarily confined in close quarters, a contagious virus represents a grave health risk to them—and graver still to those who have underlying conditions that render them medically vulnerable. . . . The COVID-19 virus is highly infectious and can be transmitted easily from person to person. . . . If contracted, COVID-19 can cause severe complications or death." (Citation omitted; internal quotation marks omitted.)), cert. denied, 343 Conn. 922, 275 A.3d 212 (2022). The petitioner further alleged that the COVID-19 virus posed a serious risk specifically to him because of his preexisting medical conditions. These preexisting conditions include chronic obstructive pulmonary disease, pneumonia, tuberculosis, atelectasis, high blood pressure, and being at high risk for colon cancer. Thus, the petitioner alleged, he was at high risk for serious symptoms associated with COVID-19, and the conditions at Osborn were putting his life at risk. Based on these allegations, we conclude that the petitioner has sufficiently pleaded that his conditions of confinement are, "in objective terms, sufficiently serious." (Internal quotation marks omitted.) *Faraday* v. *Commissioner of Correction*, supra, 288 Conn. 338.

We also conclude that the petitioner has pleaded sufficient facts as to the second prong of the deliberate indifference test—namely, that the officials involved had a sufficiently culpable state of mind, because they knew of and disregarded an excessive risk to his health and safety. See id., 338–39. In his petition, the petitioner alleged that the respondent was not handling the COVID-19 pandemic according to CDC guidelines. In particular, he alleged that the use of personal protective equipment was not enforced among inmates or prison staff.[23] He similarly alleged that social distancing was not being enforced, resulting in inmates being compelled to dine in close proximity, specifically, within two feet of each other. Based on these allegations, the petitioner claimed that the prison staff "clearly do not care about [his health and safety] at all," and had adopted a "policy of continual delay, denial and deceit [which was] compounding an already seriously precarious situation, putting [his] deteriorating health and well-being in further danger."

We note that "[w]ith respect to deliberate indifference . . . [t]he key inquiry is whether the [commissioner] responded reasonably to th[is] risk." (Internal quotation marks omitted.) *Gonzalez* v. *Commissioner*

*of Correction*, supra, 211 Conn. App. 652. In determining whether a response to COVID-19 was reasonable, courts have found relevant, among other things, policies relating to social distancing and masks. See id., 652 (court focused its inquiry on whether respondent "took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, and providing masks" (internal quotation marks omitted)); see also *Valentine* v. *Collier*, 993 F.3d 270, 284–89 (5th Cir. 2021) (deeming relevant to deliberate indifference analysis whether respondent implemented testing, social distancing, mask use, handwashing, and sanitation or cleaning); see also *Hope* v. *Warden*, 972 F.3d 310, 327–28 (3d Cir. 2020) (discussing whether prison staff wore masks and enforced social distancing in determining whether respondent warden was deliberately indifferent to inmates' medical needs); *Swain* v. *Junior*, 961 F.3d 1276, 1291 (11th Cir. 2020) ("[b]y taking other measures, besides release—including, among many other things, implementing some social-distancing measures, distributing face masks, screening inmates and staff, and providing cleaning and personal hygiene supplies—[the director of corrections] has responded reasonably to the risk of the virus"). Furthermore, "[o]ur Supreme Court consistently [has] held that reasonableness is a question of fact for the trier to determine based on all of the circumstances. . . . Recklessness likewise presents a question of fact." (Citation omitted; internal quotation marks omitted.) *Gonzalez* v. *Commissioner of Correction*, supra, 653 n.14.

Although ultimately, it may prove that the petitioner is unable to produce evidence to support his allegations of cruel and unusual punishment,[24] such a possibility cannot support the granting of a motion to dismiss. See *Finney* v. *Commissioner of Correction*, supra, 207 Conn. App. 144. We emphasize that, at the pleading stage, the allegations in the petition must be viewed in the light most favorable to the petitioner. See id., 146. Viewing the petition in such a light, we conclude that the petitioner has raised allegations sufficient to state a cognizable claim for cruel and unusual punishment.[25]

The judgment is reversed with respect to the claims of equal protection and cruel and unusual punishment, and the case is remanded for further proceedings in accordance with law; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The petitioner was self-represented throughout the proceedings before the habeas court but is represented by counsel on appeal.

[2] Practice Book § 23-29 provides: "The judicial authority may, at any time, upon its own motion or upon motion of the respondent, dismiss the petition, or any count thereof, if it determines that:

"(1) the court lacks jurisdiction;

"(2) the petition, or a count thereof, fails to state a claim upon which habeas corpus relief can be granted;

"(3) the petition presents the same ground as a prior petition previously denied and fails to state new facts or to proffer new evidence not reasonably available at the time of the prior petition;

"(4) the claims asserted in the petition are moot or premature;

"(5) any other legally sufficient ground for dismissal of the petition exists."

[3] The petitioner filed his first petition for a writ of habeas corpus on July 15, 2020, and his first amended petition on September 17, 2020. Subsequently, on December 11, 2020, the petitioner filed a "motion for permission to file additional pages to the amended petition," which was docketed as a second "amended application for writ of habeas corpus." Thus, the petitioner's second amended petition is the operative petition, which we review to determine whether the habeas court had subject matter jurisdiction.

[4] "Because this appeal arises from the habeas court's ruling dismissing the petition on the basis that the court lacked jurisdiction, we [assume] the facts [as] alleged in the petition, including those facts necessarily implied from the allegations, construing them in favor of the petitioner for purposes of deciding whether the court had subject matter jurisdiction." *Anthony A.* v. *Commissioner of Correction*, 326 Conn. 668, 670, 166 A.3d 614 (2017).

[5] The respondent assigns each inmate an overall classification assessment score of one to five, with one representing the lowest security level and five representing the highest. See Conn. Dept. of Correction, Administrative Directive 9.2 (6) and (8) (effective July 1, 2006) (Administrative Directive 9.2). In determining an inmate's overall classification assessment score, the inmate's risks and needs are assessed. Id., 9.2 (8). Seven factors determine an inmate's overall risk score. Id. Each individual factor is assigned a rating from one to five, with one representing the least risk and five representing the highest risk. See Office of Legislative Research, OLR Research Report: Department of Correction Inmate Classification (March 1, 2000) available at https://www.cga.ct.gov/2000/rpt/2000-R-0257.htm (last visited November 17, 2022). One of these factors is the presence of a detainer. See Administrative Directive 9.2 (8) (A) (5). "After independently rating each factor, [the respondent] establishes an overall risk level. The highest rating assigned to any of the seven factors determines the inmate's overall risk level. Thus if an inmate has a two on six of the factors and a four on one factor, his overall rating is a four." OLR Research Report: Department of Correction Inmate Classification, supra. Because the petitioner has a detainer lodged against him, he has been assigned a detainer score that affects his overall risk score.

[6] According to the petitioner, the detainer is a civil detainer. An immigration detainer "serves to advise another law enforcement agency that the [United States Department of Homeland Security (Department)] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien. The detainer is a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7 (a) (2022).

[7] We note that the court did not address the petitioner's equal protection claim in its memorandum of decision and that, generally, this court is not required to review issues not considered at the habeas proceeding. See, e.g., *Leon* v. *Commissioner of Correction*, 189 Conn. App. 512, 528, 208 A.3d 296, cert. denied, 332 Conn. 909, 209 A.3d 1232 (2019). We also note, however, that "a reviewing court properly may address jurisdictional claims that neither were raised nor ruled on in the trial court." *Ajadi* v. *Commissioner of Correction*, 280 Conn. 514, 535, 911 A.2d 712 (2006).

In the present case, the petitioner did raise his equal protection claim in his operative petition, but the court did not address the claim. The petitioner attempted to rectify this deficiency by filing a motion to reargue, asserting that the court failed to address his equal protection claim; however, the court denied the motion. Nevertheless, we address this claim because the parties have fully briefed the merits of the jurisdictional issue as it pertains to the petitioner's equal protection claim. Additionally, the claim is based on undisputed procedural facts and, therefore, does not require a review of any factual determinations, and the petition can reasonably be read broadly to include such a claim.

[8] General Statutes § 18-81w (a) provides: "The Criminal Justice Policy and Planning Division within the Office of Policy and Management shall develop and implement a comprehensive reentry strategy that provides a continuum of custody, care and control for offenders who are being supervised in the community, especially those offenders who have been discharged from the

custody of the Department of Correction, and assists in maintaining the prison population at or under the authorized bed capacity. The reentry strategy shall support the rights of victims, protect the public and promote the successful transition of offenders from incarceration to the community by (1) maximizing any available period of community supervision for eligible and suitable offenders, (2) identifying and addressing barriers to the successful transition of offenders from incarceration to the community, (3) ensuring sufficient criminal justice resources to manage offender caseloads, (4) identifying community-based supervision, treatment, educational and other services and programs that are proven to be effective in reducing recidivism among the population served by such services and programs, and (5) establishing employment initiatives for offenders through public and private services and partnerships by reinvesting any savings achieved through a reduction in prison population."

[9] General Statutes § 18-81x provides: "For the fiscal year ending June 30, 2007, and each fiscal year thereafter, the sum of $350,000 from revenue derived by the Department of Administrative Services from the contract for the provision of pay telephone service to inmates of correctional facilities shall be transferred to the Department of Correction, for Other Current Expenses, for expanding inmate educational services and reentry program initiatives."

[10] General Statutes § 18-81z provides: "The Department of Correction, the Board of Pardons and Paroles and the Court Support Services Division of the Judicial Branch shall develop a risk assessment strategy for offenders committed to the custody of the Commissioner of Correction that will (1) utilize a risk assessment tool that accurately rates an offender's likelihood to recidivate upon release from custody, and (2) identify the support programs that will best position the offender for successful reentry into the community. Such strategy shall incorporate use of both static and dynamic factors and utilize a gender-responsive approach that recognizes the unique risks and needs of female offenders. In the development of such risk assessment strategy, the department, board and division may partner with an educational institution that has expertise in criminal justice and psychiatry to evaluate risk assessment tools and customize a risk assessment tool to best meet the state's needs. On or before January 1, 2009, and annually thereafter, the department, board and division shall report to the Governor and the joint standing committee of the General Assembly on judiciary, in accordance with section 11-4a, on the development, implementation and effectiveness of such strategy."

[11] The respondent's appellate brief addresses only the first two of the petitioner's three claims— the due process claim and the equal protection claim. The respondent does not address the petitioner's third claim, namely, that the respondent violated his right to be free from cruel and unusual punishment.

[12] Although the petitioner twice amended his petition after the respondent filed his motion to dismiss, the respondent did not file an objection to either of the amended petitions; nor did the respondent seek to amend his motion to dismiss after the petitioner filed the amended petitions.

[13] The respondent also argued that the petitioner's COVID-19 claim had been released and was barred based on a settlement agreement reached in *McPherson* v. *Lamont*, United States District Court, Docket No. 3:20-CV-0534 (JBA) (D. Conn. July 20, 2020). In its memorandum of decision, the court concluded that the claim was not barred by the *McPherson* settlement because the settlement was approved on July 20, 2020, whereas the habeas petition was filed on July 15, 2020. The respondent does not reassert this argument on appeal.

[14] In its memorandum of decision, the court stated that it had subject matter jurisdiction over the petitioner's cruel and unusual punishment claim, and yet the court dismissed the petition in its entirety without providing a specific reason relating to that particular claim. On review, we see no basis for the court to have dismissed this claim, without a hearing on the merits, on the basis of either Practice Book § 23-29 (2) or (5).

[15] On July 21, 2021, this court ordered, sua sponte, that the habeas court articulate whether it had considered the petitioner's second amended petition for a writ of habeas corpus when ruling on the respondent's motion to dismiss. In its articulation, dated July 27, 2021, the habeas court explained that it had reviewed and considered the petitioner's second amended petition when ruling on the motion to dismiss.

[16] Both parties, in their appellate briefs, have analyzed the petitioner's due process claim under the stigma plus test.

[17] We also note that no court has extended the stigma plus test to apply beyond instances in which the petitioner is labeled a sex offender. The petitioner neglects to set forth any argument that the stigma plus test should be extended beyond the context of cases involving classification as a sex offender.

[18] "The stigma plus test is conjunctive and, therefore, we need not consider whether the petitioner sufficiently alleged facts satisfying the remaining portions of the test." *Stephenson* v. *Commissioner of Correction*, supra, 203 Conn. App. 331 n.12.

[19] Because §§ 18-81w, 18-81x and 18-81z do not expressly limit rehabilitative programs to citizens of the United States, the petitioner's claim can be understood only as a claim of an equal protection violation as applied to him, and not on its face. See *State* v. *Jason B.*, 248 Conn. 543, 558 n.12, 729 A.2d 760, cert. denied, 528 U.S. 967, 120 S. Ct. 406, 145 L. Ed. 2d 316 (1999).

[20] To the extent that the respondent argues that the petitioner is not being treated differently than similarly situated inmates, namely, those inmates also with detainers lodged against them, we emphasize that this argument goes to whether the petitioner can prove his claim rather than whether he has sufficiently alleged an equal protection claim.

[21] Also of import, we acknowledge that the detainer itself does not make the petitioner ineligible for rehabilitative programs, including reentry, discharge planning, and community release. As described in footnote 6 of this opinion, a civil immigration detainer serves, in short, as a request that the respondent notify the United States Department of Homeland Security prior to the release of the petitioner. See 8 C.F.R. § 287.7 (a) (2022); see also General Statutes § 54-192h (a) (2) (C). Rather, it is the respondent's own inmate classification system that is limiting the petitioner's access to rehabilitative programs, such as reentry, discharge planning, and community release. See Conn. Dept. of Correction, Administrative Directive 9.2 (11) (effective July 1, 2006).

[22] The respondent's appellate brief fails to address the petitioner's cruel and unusual punishment claim. At oral argument, however, counsel for the respondent argued that no habeas court in this jurisdiction has granted a petition for a writ of habeas corpus based on a COVID-19 claim of cruel and unusual punishment. We find this argument unpersuasive. Simply because no habeas court in this jurisdiction has granted such a petition does not mean that the Superior Court, sitting on habeas matters, lacks the subject matter jurisdiction to do so.

[23] The petitioner alleged that the lack of enforcement of the use of personal protective equipment violated Executive Order No. 7BB issued by Governor Ned Lamont on April 22, 2020, relating to the use of face masks, an April 21, 2020 memorandum from then Commissioner Rollin Cook to all department staff regarding the wearing of masks, and the terms of a settlement agreement between the department and the American Civil Liberties Union Foundation of Connecticut in *McPherson* v. *Lamont*, United States District Court, Docket No. 3:20-CV-0534 (JBA) (D. Conn. July 20, 2020). See footnote 13 of this opinion.

[24] This may, of course, be true as to the entirety of the petition.

[25] We also note that the court could grant relief on the petitioner's equal protection and cruel and unusual punishment claims if the petitioner is able to prove them. The petitioner, in his prayer for relief, sought "[a]ny other relief the court deems just and proper under the circumstances." "[T]he habeas court has considerable discretion to frame a remedy that is commensurate with the scope of the established constitutional violations . . . ." (Emphasis omitted; internal quotation marks omitted.) *Marshall* v. *Commissioner of Correction*, 206 Conn. App. 461, 471, 261 A.3d 49, cert. denied, 338 Conn. 916, 259 A.3d 1180 (2021).